Filed 10/20/21  P. v. Zavala CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. EDGAR IVAN ZAVALA, Defendant and Appellant. | F081537 (Super. Ct. No. BF117628A) OPINION |

THE COURT\*

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Kathryn L. Althizer, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Levy, Acting P. J., Detjen, J. and Peña, J.

**INTRODUCTION**

In 2008, separate juries found petitioner Edgar Ivan Zavala guilty of the first degree murder of Luis Ramirez (Pen. Code,[1] § 187, subd. (a); count 1) and the second degree murder of Stephanie Gutierrez (§ 187, subd. (a); count 2).  The trial court sentenced petitioner on count 1 to a term of life without the possibility of parole, and on count 2 to a term of 15 years to life, to be served concurrently.

In 2019, petitioner filed a petition, pursuant to section 1170.95, seeking resentencing on his murder convictions.  Following briefing, the trial court denied the petition on the ground petitioner was prosecuted and convicted as a direct aider and abettor, and therefore ineligible for resentencing.

On appeal, petitioner asserts he established a prima facie claim for resentencing relief and the court therefore erred in denying the petition without issuing an order to show cause or holding an evidentiary hearing.

We conclude the court did not err in denying the petition without issuing an order to show cause or holding an evidentiary hearing because the record establishes petitioner was prosecuted and convicted as a direct aider and abettor and he therefore is ineligible for resentencing as a matter of law.  Accordingly, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

This court previously summarized the facts underlying petitioner's offenses as follows:[2]

> "Armando Ayala was the primary witness against [petitioner]. Although originally charged with two counts of murder, he was allowed to plead to one count of assault with a firearm and one count of being an accessory after the fact.  His agreed prison sentence was four years in exchange for his truthful testimony against [petitioner].  He testified as an accomplice as a matter of law.

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     We previously granted the petitioner's request for judicial notice of the records on appeal in *People v. Zavala*, cases Nos. F056331 and F055345.

"On January 13, 2007, Ayala and [petitioner] had been friends for approximately three weeks. They were 'hanging out' and drinking at the home of Raudel Medrano. Medrano had known [petitioner] for several years and had known Ayala for only two or three weeks. [Petitioner] and Ayala left Medrano's home that evening at approximately 10 p.m.

"Ayala testified that after they left Medrano's house, Ayala and [petitioner] came in contact with Stephanie Gutierrez and Vanessa Trejo in the alley behind the home of victim Ramirez. At first, the contact was cordial as [petitioner] and Ayala helped the women move some clothes. The conversation then became heated. Trejo recognized Ayala as the grandson of Gumercinda Sixtos. Trejo's family members and Sixtos had been involved in a rent dispute. Trejo called Ayala a punk and made derogatory remarks towards Ayala's family. [Petitioner] backed up Ayala and told Trejo to shut up.

"As Ayala walked away to relieve himself, the argument between Trejo and [petitioner] became more heated. Trejo told [petitioner] he too was a punk and he was going to die. [Petitioner] said Trejo was a bitch and told her to shut up. [Petitioner] slapped Trejo and she swung at him with an empty bottle. Ayala grabbed [petitioner] and they left.

"[Petitioner] asked Ayala if he still had a shotgun. [Petitioner] had seen the shotgun at an earlier date. Ayala had found the shotgun in his grandmother's garage, where he was living. Ayala had fired the weapon on New Year's Eve. He testified that [petitioner] was not there when he fired the gun on New Year's Eve, but arrived at about 1 a.m. [Petitioner] and Ayala stopped first at 'D's' house and acquired some shotgun shells. They then went to Ayala's house. Ayala went to the bathroom; when he emerged from the bathroom, [petitioner] was seated on Ayala's bed with the shotgun.

"Ayala and [petitioner] returned to Ramirez's home, where Ayala, [petitioner], and Trejo had argued in the alley earlier. Ayala stood on the side of the house. [Petitioner] went to the front door carrying the gun. [Petitioner] knocked on the door, and a male (Ramirez) answered the door. [Petitioner] asked for Gutierrez, Ramirez responded that Gutierrez was right there. Ramirez then said 'what the fuck' and tried to close the door. Ayala heard a shotgun blast. He heard two more blasts inside the house in quick succession, followed by the sound of a female moaning.

3.

"Ayala looked around the corner of the house and saw [petitioner] coming out the door. Ayala and [petitioner] ran, with [petitioner] carrying the gun. [Petitioner] fired one more shot in the alley.

"[Petitioner] and Ayala ran to Medrano's house, where they encountered Trejo in the street with her boyfriend. Trejo started taunting them, and [petitioner] pointed the gun at Trejo's boyfriend. Trejo grabbed the gun and a struggle ensued. Ayala ran to the door of Medrano's house and asked Medrano for help. Medrano came out and took the gun away from [petitioner] and Trejo. He told everyone to leave.

"Ayala and [petitioner] then went to [petitioner's] house. Ayala spent the night at the house. When Ayala woke up the next morning, he went to his house. He was arrested later in the day.

"When Ayala was initially questioned by law enforcement, he denied knowledge of the killings. After talking to his father, Ayala told officers what happened the evening of January 13, 2007.

"*Testimony of Other Witnesses*

"Other witnesses corroborated the account of the evening testified to by Ayala. Trejo testified that she was with Gutierrez on the evening of January 13, 2007. They encountered [petitioner] and Ayala outside of Ramirez's house. Trejo got into an argument with Ayala and [petitioner]. [Petitioner] called her a bitch. She slapped him and he slapped her back. An exchange of death threats occurred between [petitioner] and Trejo. Trejo went inside of Ramirez's house and called Alfredo Carmona to come and pick her up.

"Carmona testified that he gave Trejo a ride to Ramirez's house on the evening of January 13, 2007. He got a telephone call to come back and pick her up. Carmona picked up Trejo, driving his vehicle with a loud exhaust system. After picking up Trejo, Carmona saw [petitioner] and another male walking in the direction of Ramirez's house. While driving around with Trejo and her boyfriend, Carmona saw [petitioner] again; this time he was running from the direction of Ramirez's house. Carmona dropped off Trejo and her boyfriend in an alley.

"As Trejo and her boyfriend walked back towards Ramirez's house from the point where they were dropped off by Carmona, they encountered [petitioner] and Ayala. Trejo confronted [petitioner] near Medrano's house and said to him, 'I thought you said you were going to kill me.' At this

4.

point [petitioner] took out a gun. Trejo grabbed the gun and a struggle ensued. Medrano came out of the house and took the gun.

"Trejo left and walked towards Ramirez's house. She was stopped by law enforcement and questioned at the sheriff's substation.

"Medrano testified regarding the presence of [petitioner] and Ayala at his house earlier in the evening of January 13, 2007, and also later in the evening when Medrano took the gun away from [petitioner] and Trejo. The gun was taken inside by Medrano. It accidently went off on his bed.

"A neighbor of Ramirez, John Reid, went outside on the evening of January 13, 2007, and saw a male and a female near Ramirez's residence. Reid went to the home of a neighbor who lived in the house in front of Ramirez. Reid told her that the side gate was open and asked her if she wanted him to close it. As Reid went to close the gate, he no longer saw the male and female near Ramirez's home. Reid heard a loud truck leaving the area. Approximately five to six minutes later, as Reid returned to his home, he heard a gunshot, then another gunshot. Reid ran to Ramirez's house and saw him in a pool of blood by the front door. A few days later he found a shell casing in the alley. The shell was turned in to law enforcement.

"Ramirez died at the scene from a gunshot wound to his head. The pathologist who performed the autopsy testified that the wound to Ramirez would have caused blood spatter to go in every direction. Gutierrez died at the hospital from a gunshot wound to the abdomen.

"The shirt identified as the one [petitioner] was wearing the night of the murder was seized from his home. The shirt had two small spots on it that appeared to be blood. The shirt was sent for testing. The serologist who tested the spot from the shirt said the spot contained a major donor of DNA and two minor donors. The major donor was consistent with victim Ramirez. One of the minor donors was consistent with [petitioner].

"A shotgun was seized from the roof of Medrano's home. It was determined that the shotgun shells seized from the homicide scene and the shell found by Reid in the alley were fired from the gun retrieved from the roof of Medrano's home.

"*The 'Kite'*

"On June 1, 2008 (after completion of the first trial) a deputy sheriff in the jail found a 'kite' (a note passing information among inmates) in

5.

[petitioner's] single cell.  The kite was from [petitioner] to 'Bleu.'  It asked Bleu to read the message to Ayala, asking Ayala to change his story when they go back to trial.  [Petitioner] asked Ayala to help him out and do this final favor for him.  In addition, the note said, 'Don't tell them it was you,' but asked Ayala to 'switch all kinds of shit up and tell them that what you said was what the D.A. told you to say.'

"*Defense*

"Gumercinda Sixtos, Ayala's grandmother, testified that Ayala had been living with her since December of 2006.  Her deceased husband had a shotgun that Sixtos kept in the garage.  She never saw Ayala with the gun.  In addition, every day she cleaned out the closet where Ayala said he kept the gun.  She never saw the gun in the closet during her daily cleaning, and the closet did not contain many items.  Sixtos did not hear any gunshots on New Year's Eve when Ayala was in her driveway with friends.

"Fifteen-year-old G.E. testified that [petitioner] was at her house on New Year's Eve.  He arrived at approximately 9 p.m. and left at 1 or 2 a.m."  (*People v. Zavala* (Oct. 27, 2009, F056331) [nonpub. opn.].)

On April 26, 2007, the Kern County District Attorney filed an information charging petitioner with the first degree murders of Ramirez (§ 187, subd. (a); count 1) and Gutierrez (§ 187, subd. (a); count 2).  As to each count, the information alleged petitioner personally and intentionally discharged a firearm which proximately caused great bodily injury or death.  (§ 12022.53, subd. (d).)  Additionally, the information alleged a multiple-murder special circumstance.  (§ 190.2, subd. (a)(3).)

On April 17, 2008, a jury convicted petitioner of the second degree murder of Gutierrez on count 2, but found not true the allegation that petitioner personally and intentionally discharged a firearm as to that count.  The jury could not reach a unanimous verdict on count 1 and the court declared a mistrial as to that count.  The jury also found the multiple-murder special circumstance not true.  On May 15, 2008, the trial court sentenced petitioner on count 2 to a term of 15 years to life.

Petitioner was retried on count 1.  Prior to trial, petitioner stipulated that, if the jury found him guilty of first degree murder on count 1, the multiple-murder special

6.

circumstance would be found true. On August 6, 2008, the jury convicted him of the first degree murder of Ramirez. The jury was unable to reach a verdict on the firearm allegation. The court declared a mistrial as to that allegation and dismissed it. On October 15, 2008, the trial court sentenced petitioner to a term of life without the possibility of parole on count 1, to be served concurrently with the sentence on count 2.

In separate appeals, this court affirmed both convictions. (*People v. Zavala* (Oct. 27, 2009, F056331) [nonpub. opn.]; *People v. Zavala* (Oct. 27, 2009, F055345) [nonpub. opn.].)

On January 14, 2019, petitioner, in propria persona, filed a petition for resentencing pursuant to section 1170.95. In the form petition, petitioner stated that a complaint, information, or indictment was filed against him that allowed him to be prosecuted under a theory of felony murder or murder under the natural and probable consequences doctrine; he was convicted of first or second degree murder at trial; and he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019.[3]

On February 22, 2019, the court appointed counsel to represent petitioner on the petition.

On March 1, 2019, the People filed a motion to dismiss the petition, arguing section 1170.95 is unconstitutional.[4] On May 21, 2019, the People filed an opposition to the petition on the merits, arguing petitioner was the actual killer, was a direct aider and abettor, or was a major participant in the murder. On July 31, 2020, petitioner filed a

---

**3** A brief reference in petitioner's opening brief suggests he is challenging the resentencing determination only with respect to his conviction on count 2. The briefing and the proceedings below otherwise address both counts. We address both counts as well.

**4** The motion was briefed and eventually denied.

7.

reply, arguing he was not the actual killer, and there was not substantial evidence he directly aided and abetted the murders or acted with reckless indifference to human life.

On August 4, 2020, the court held a hearing and stated it had reviewed the jury instructions and found no instructions were given with regard to felony murder or the natural and probable consequences doctrine.[5]  The court continued:

> "So my tentative would be to find that in this case this is a straight aider and abettor theory; that it is not a felony murder conviction; it is not a natural and probable consequence doctrine case; and that, therefore, as a matter of law, the petition fails to meet the requirements of [Senate Bill No.] 1437 and Penal Code Section 1170.95."

After further argument, the court determined that petitioner was ineligible for resentencing as a matter of law because he was convicted as a direct aider and abettor and was not convicted of felony murder or murder under the natural and probable consequences doctrine.  On that basis, the petition was denied.

This timely appeal followed.

## DISCUSSION

### I.    Senate Bill No. 1437 (2017-2018 Reg. Sess.) and Section 1170.95

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 (2017-2018 Reg. Sess.) "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  The bill accomplished this task by adding three separate provisions to the Penal Code.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)  First, to amend the natural and probable consequences doctrine, the bill added section 188, subdivision (a)(3), which requires a principal to act with malice aforethought

---

[5]    Defense counsel noted she only had access to the jury instructions from the first trial, and assumed they were similar in the second trial.

before he or she may be convicted of murder. (§ 188, subd. (a)(3); accord, *Gentile*, at pp. 842-843.) Second, to amend the felony-murder rule, the bill added section 189, subdivision (e):

> "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."[6] (§ 189, subd. (e); accord, *Gentile*, at p. 842.)

Finally, the bill "added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above."[7] (*Gentile*, at p. 843.)

"Section 1170.95 lays out a process for a person convicted of felony murder or murder under a natural and probable consequences theory to seek vacatur of his or her conviction and resentencing." (*Gentile*, *supra*, 10 Cal.5th at p. 853.) First, "an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could

---

[6]     Additionally, section 189 was amended to allow for felony-murder liability where the victim is a peace officer. (§ 189, subd. (f); accord, *People v. Daniel* (2020) 57 Cal.App.5th 666, 672, review granted Feb. 24, 2021, S266336.)

[7]     The Legislature recently passed, and the Governor signed, a bill amending section 1170.95. (Sen. Bill No. 775 (2021-2022 Reg. Sess.).) The amendments are not yet effective (Cal. Const., art. IV, § 8, subd. (c)(1)) and, in any event, would not alter our analysis. We quote from the version of section 1170.95 presently in effect.

not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' (§ 1170.95, subd[]. (a)(1)-(3); see also § 1170.95, subd. (b)(1)(A).) Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' (§ 1170.95, subd. (b)(1)(C).) If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' (§ 1170.95, subd. (b)(2).)" (*People v. Lewis* (2021) 11 Cal.5th 952, 959-960 (*Lewis*).)

Where the petition complies with the requirements of section 1170.95, subdivision (b)(1), counsel must be appointed, if requested. The prosecutor must file a response and the petitioner may file a reply. The trial court must then review the petition to determine if the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1170.95, subd. (c); *Lewis*, *supra*, 11 Cal.5th at pp. 961-963, 967.) In making this determination, the court may rely on the record of conviction. (*Lewis*, at pp. 970-971.) However, the prima facie inquiry is limited and, at this stage of the proceedings, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id*. at pp. 971-972.)

If the court determines the petitioner has met his or her prima facie burden, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must 'prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1170.95, subd. (d)(3).) 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' (*Ibid.*)" (*Gentile*, *supra*, 10 Cal.5th at p. 853.)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an

10.

evidentiary hearing. (*Lewis*, *supra*, 11 Cal.5th at pp. 972-974; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II.     The Petition was Properly Denied

Petitioner contends he set forth a prima facie claim for relief and the trial court erred in summarily denying his petition without issuing an order to show cause or holding an evidentiary hearing. We conclude the petition was properly denied at the prima facie stage because the record establishes petitioner is ineligible for resentencing as a matter of law.

To be eligible for relief pursuant to section 1170.95, petitioner must have been convicted of felony murder or murder under a natural and probable consequences theory. (§ 1170.95, subd. (a); accord, *Gentile*, *supra*, 10 Cal.5th at p. 853.) Here, the record establishes that petitioner was not convicted under either theory. In both trials, the jury was instructed on the elements of both first and second degree murder, as well as direct aiding and abetting. The jury was not instructed on felony murder or murder under a natural and probable consequences theory. In both cases, the prosecution argued petitioner was guilty of murder, either as the shooter or as a direct aider and abettor who acted with at least implied malice. The prosecution did not argue petitioner was guilty of felony murder or murder under a natural and probable consequences theory in either case. There is therefore no possibility the jury found petitioner guilty under either theory. Because petitioner was not convicted of felony murder or murder under a natural and probable consequences theory, he is ineligible for resentencing as a matter of law.[8] The

---

[8]     The record additionally establishes petitioner acted with intent to kill with respect to count 1. This is because petitioner stipulated to the truth of a multiple-murder special circumstance pursuant to section 190.2, subdivision (a)(3), which imposes a sentence of death or life without the possibility of parole when the defendant is convicted of more than one offense of murder in the first or second degree. This special circumstance applies only where the defendant intended to kill a victim of murder in the first degree. (§ 190.2, subds. (a)(3), (c).) By stipulating to the truth of the special circumstance, petitioner thereby stipulated that he had the requisite intent to sustain a murder conviction

court was not required to issue an order to show cause and the petition was properly denied. (*Lewis*, *supra*, 11 Cal.5th at pp. 970-971.)

Despite the foregoing, petitioner contends an order to show cause was warranted. He first contends the court was not authorized to review the record of conviction to determine whether he stated a prima facie claim for relief. Our Supreme Court recently rejected this argument in *Lewis*. (*Lewis*, *supra*, 11 Cal.5th at pp. 970-971.) Indeed, our Supreme Court has stated that "[t]he record of conviction will necessarily inform the trial court's prima facie inquiry under section 1170.95, allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Id.* at p. 971.) Accordingly, the trial court did not err in considering the record of conviction to determine whether petitioner stated a prima facie case.

Petitioner next contends that section 1170.95 does not limit relief to persons *convicted* under the felony-murder rule or the natural and probable consequences doctrine, so long as the defendant was *charged* in a way that would permit such conviction. However, section 1170.95 allows "[a] person convicted of felony murder or murder under a natural and probable consequences theory" to file a petition for resentencing. (§ 1170.95, subd. (a).) Such persons are eligible for relief if they could no longer "be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(3).) Thus, in order for a petitioner to state a prima facie claim for relief, there must be some basis to conclude he or she was convicted, but could no longer be convicted, under the felony murder rule or the natural and probable consequences doctrine. (See *Gentile*, *supra*, 10 Cal.5th at p. 853; see also *People v. Soto* (2020) 51 Cal.App.5th 1043, 1055-1057, review granted

under the law as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.), at least with respect to count 1. He therefore is ineligible for resentencing on count 1 as a matter of law based on this additional ground.

Sept. 23, 2020, S263939 (*Soto*), abrogated on another ground by *Lewis*, *supra*, 11 Cal.5th at p. 967.) Here, the record excludes such possibility.

Petitioner next suggests the jury instructions on implied malice allowed him to be convicted under a natural and probable consequences theory.[9] The challenged instructions provide, in relevant part, that malice is implied when: "1. The killing resulted from an intentional act; [¶] 2. The *natural consequences* of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (Italics added.) Although the "natural consequences" language of the instructions is seemingly similar to the natural and probable consequences doctrine, these are two "distinctly different concepts." (*Soto*, *supra*, 51 Cal.App.5th at p. 1056, review granted; accord, *People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*), abrogated on another ground by Sen. Bill No. 1437 (2017-2018 Reg. Sess.).) A direct aider and abettor to murder must at least share the mens rea of the actual perpetrator, i.e., express or implied malice. (*Soto*, at p. 1057.) In contrast, an accomplice whose liability for murder is premised on the natural and probable consequences doctrine "need only intend to aid a different, less serious 'target' crime," the natural and probable consequence of which is murder. (*Ibid*.) Here, the jury was not instructed on the natural and probable consequence doctrine or any target crime upon which murder based on a natural and probable consequences theory could be predicated. The "natural consequences" language of the malice instruction does not transform petitioner's murder conviction as a direct aider and abettor into one under the natural and probable consequences doctrine. (*Id.* at pp. 1058-1059.)

Lastly, petitioner seemingly contends he was convicted under a theory of implied malice that was overturned in *Chiu*. (*Chiu*, *supra*, 59 Cal.4th 155.) Petitioner is

---

[9] Again, defendant stipulated to the multiple-murder enhancement and, in so doing, stipulated that he acted with express malice with respect to count 1.

incorrect.  *Chiu* eliminated liability for first degree premeditated murder under the natural and probable consequences doctrine, holding instead that only second degree murder is commensurate with the culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in murder.  (*Id.* at pp. 158-159, 166.)  However, *Chiu* did not alter the law governing liability based on direct aiding and abetting principles.  (See *id.* at pp. 159, 166-167.)  *Chiu* therefore does not provide a basis for granting the resentencing petition.

Accordingly, petitioner is ineligible for relief as a matter of law, and the petition was properly denied.

## **DISPOSITION**

The order is affirmed.